RACHELE R. BYRD (SBN 190634)
MARISA C. LIVESAY (SBN 223247)
BRITTANY N. DEJONG (SBN 258766)
**WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ LLP**
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
byrd@whafh.com
livesay@whafh.com
dejong@whafh.com

*Attorneys for Plaintiff*

[Additional Counsel on Signature Page]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SHIVA STEIN, <br><br> Plaintiff, <br><br> v. <br><br> MAXIM INTEGRATED PRODUCTS, INC., TRACY ACCARDI, JAMES R. BERGMAN, JOSEPH R. BRONSON, TUNC DOLUCA, ROBERT E. GRADY, MERCEDES JOHNSON, WILLIAM P. SULLIVAN, WILLIAM D. WATKINS, and MARYANN WRIGHT, <br><br> Defendants. | Case No. <br><br> **COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934** <br><br> <u>DEMAND FOR JURY TRIAL</u> |

Plaintiff Shiva Stein ("Plaintiff"), by her attorneys, makes the following allegations against Maxim Integrated Products, Inc. ("Maxim" or the "Company") and the members of the board of directors of Maxim (the "Board" or "Individual Defendants," along with Maxim, collectively referred to as the "Defendants"), for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), SEC Rule 14a-9, 17 C.F.R. 240.14a-9, and Regulation G, 17 C.F.R. § 244.100 in connection with the proposed acquisition of Maxim by affiliates of Analog Devices, Inc. ("Analog"). The allegations in this complaint are based on the personal knowledge of Plaintiff as to herself and on information and belief (including the investigation of counsel and review of publicly available information) as to all other matters stated herein.

**INTRODUCTION**

1. This is an action brought by Plaintiff to enjoin the Proposed Transaction whereby Magneto Corp., a wholly owned subsidiary of Analog, will merge with an into Maxim, with Maxim continuing as the surviving corporation and becoming a wholly owned subsidiary of Analog (the "Proposed Transaction"). Upon the completion of the Proposed Transaction, Maxim shareholders will have the right to receive 0.6300 shares of Analog common stock for each share of Maxim common stock owned (the "Merger Consideration"). The Board has unanimously recommended to the Company's stockholders that they vote for the Proposed Transaction at the special meeting of the Maxim shareholders. Maxim shareholders will own approximately 31% of Analog immediately following the closing of the Proposed Transaction.

2. To convince Maxim stockholders to vote in favor of the Proposed Transaction, on August 18, 2020, the Board authorized the filing of a materially incomplete and misleading Registration Statement on Form S-4 (the "Registration Statement") with the Securities and Exchange Commission ("SEC"). The Registration Statement violates Sections 14(a) and 20(a) of the Exchange Act by noncompliance with Regulation G and SEC Rule 14a-9 (17 C.F.R. § 244.100 and 17 C.F.R. § 240.14a-9, respectively).

3. Defendants have failed to disclose certain material information necessary for Maxim stockholders to properly assess the fairness of the Proposed Transaction, thereby violating SEC rules

and regulations and rendering certain statements in the Registration Statement materially incomplete and misleading.

4. In particular, the Registration Statement contains materially incomplete and misleading information concerning the financial forecasts for the Company prepared and relied upon by the Board in recommending to the Company's stockholders that they vote in favor of the Proposed Transaction. The same forecasts were used by Maxim's financial advisor, J.P. Morgan Securities LLC ("J.P. Morgan") in conducting their valuation analyses in support of their fairness opinions. The Registration Statement also contains materially incomplete and misleading information concerning certain financial analyses performed by J.P. Morgan.

5. The material information that has been omitted from the Registration Statement must be disclosed prior to the forthcoming stockholder vote in order to allow the stockholders to make an informed decision regarding the Proposed Transaction.

6. For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act, based on Defendants' violations of Regulation G and Rule 14a-9. Plaintiff seeks to enjoin Defendants from holding the stockholders vote on the Proposed Transaction and taking any steps to consummate the Proposed Transaction unless, and until, all material information discussed below is disclosed to Maxim stockholders sufficiently in advance of the vote on the Proposed Transaction or, in the event the Proposed Transaction is consummated without corrective disclosures, to recover damages resulting from Defendants' violations of the Exchange Act.

**JURISDICTION AND VENUE**

7. This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act.

8. This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that does sufficient business in California or an individual who has sufficient minimum contacts with California to render the exercise of jurisdiction by the California courts permissible under traditional notions of fair play and substantial justice. All of the Defendants

conduct business and/or maintain offices in California.  The corporate office of Maxim is located in San Jose, California.

9. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because Maxim is headquartered in this District.

## PARTIES

10. Plaintiff has owned the common stock of Maxim since prior to the announcement of the Proposed Transaction herein complained of and continues to own this stock.

11. Maxim is a corporation duly organized and existing under the laws of Delaware and maintains its principal offices in San Jose, California.  Maxim is, and at all relevant times hereto was, listed and traded on the NASDAQ Stock Exchange under the symbol "MXIM."

12. Defendant Tracy Accardi has been a member of the Board since 2016.

13. Defendant James R. Bergman has been a member of the Board since 1988.

14. Defendant Joseph R. Bronson has been a member of the Board since 2007.

15. Defendant Tunc Doluca has been a member of the Board since 2007 and is the Company's President and Chief Executive Officer.

16. Defendant Robert E. Grady has been a member of the Board since 2008.

17. Defendant Mercedes Johnson has been a member of the Board since 2019.

18. Defendant William P. Sullivan has been a member of the Board since 2015.

19. Defendant William D. Watkins has been a member of the Board since 2008.

20. Defendant MaryAnn Wright has been a member of the Board since 2016.

21. The Defendants referred to in paragraphs 12-20 are collectively referred to herein as the "Individual Defendants" and/or the "Board."

22. The Defendants referred to in paragraphs 11-20 are collectively referred to herein as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

*The Proposed Transaction*

23. On July 13, 2020, Maxim and Analog jointly announced that they had entered into the Agreement and Plan of Merger (the "Merger Agreement"):

Analog Devices, Inc. (Nasdaq: ADI) and Maxim Integrated Products, Inc. (Nasdaq: MXIM) today announced that they have entered into a definitive agreement under which ADI will acquire Maxim in an all stock transaction that values the combined enterprise at over $68 billion2. The transaction, which was unanimously approved by the Boards of Directors of both companies, will strengthen ADI as an analog semiconductor leader with increased breadth and scale across multiple attractive end markets.

Under the terms of the agreement, Maxim stockholders will receive 0.630 of a share of ADI common stock for each share of Maxim common stock they hold at the closing of the transaction. Upon closing, current ADI stockholders will own approximately 69 percent of the combined company, while Maxim stockholders will own approximately 31 percent. The transaction is intended to qualify as a tax-free reorganization for U.S. federal income tax purposes.

"Today's exciting announcement with Maxim is the next step in ADI's vision to bridge the physical and digital worlds. ADI and Maxim share a passion for solving our customers' most complex problems, and with the increased breadth and depth of our combined technology and talent, we will be able to develop more complete, cutting-edge solutions," said Vincent Roche, President and CEO of ADI. "Maxim is a respected signal processing and power management franchise with a proven technology portfolio and impressive history of empowering design innovation. Together, we are well-positioned to deliver the next wave of semiconductor growth, while engineering a healthier, safer and more sustainable future for all."

"For over three decades, we have based Maxim on one simple premise – to continually innovate and develop high-performance semiconductor products that empower our customers to invent. I am excited for this next chapter as we continue to push the boundaries of what's possible, together with ADI. Both companies have strong engineering and technology know-how and innovative cultures. Working together, we will create a stronger leader, delivering outstanding benefits to our customers, employees and shareholders," said Tunç Doluca, President and CEO of Maxim Integrated.

Upon closing, two Maxim directors will join ADI's Board of Directors, including Maxim President and CEO, Tunç Doluca.

**Compelling Strategic and Financial Rationale**

- Industry Leader with Increased Global Scale: The combination strengthens ADI's analog semiconductor leadership position with expected revenue of $8.2 billion and free cash flow of $2.7 billion on a pro forma basis. Maxim's strength in the automotive and data center markets, combined with ADI's strength across the broad industrial, communications and digital healthcare

      markets are highly complementary and aligned with key secular growth trends. With respect to power management, Maxim's applications-focused product offerings complement ADI's catalog of broad market products.

- Enhanced Domain Expertise & Capabilities: Combining best-in-class technologies will enhance ADI's depth of domain expertise and engineering capabilities from DC to 100 gigahertz, nanowatts to kilowatts and sensor to cloud, with more than 50,000 products. This will enable the combined company to offer more complete solutions, serve more than 125,000 customers and capture a larger share of a $60 billion total addressable market.

- Shared Passion for Innovation-led Growth: The combination brings together similar cultures focused on talent, innovation and engineering excellence with more than 10,000 engineers and approximately $1.5 billion in annual research and development investment. The combined company will continue to be a destination for the most talented engineers in multiple domains.

- Earnings Accretion & Cost Savings: This transaction is expected to be accretive to adjusted EPS in 18 months subsequent to closing with $275 million of cost synergies by the end of year two, driven primarily by lower operating expenses and cost of goods sold. Additional cost synergies from manufacturing optimization are expected to be realized by the end of year three subsequent to closing.

- Strong Financial Position & Cash Flow Generation: ADI expects the combined company to yield a stronger balance sheet, with a pro forma net leverage ratio of approximately 1.2x. This transaction is also expected to be accretive to free cash flow at close, enabling additional returns to shareholders.

**Timing and Approvals**

The transaction is expected to close in the summer of 2021, subject to the satisfaction of customary closing conditions, including receipt of U.S. and certain non-U.S. regulatory approvals, and approval by stockholders of both companies.

**Advisors**

Morgan Stanley served as lead financial advisor to ADI. BofA Securities also served as a financial advisor. Wachtell, Lipton, Rosen & Katz served as legal counsel.

J.P. Morgan served as exclusive financial advisor to Maxim, and Weil, Gotshal & Manges LLP served as legal counsel.

*The Materially Misleading and Incomplete Solicitation Statement*

24. On August 18, 2020, Defendants caused the Registration Statement to be filed with the SEC in connection with the Proposed Transaction. The Registration Statement solicits the Company's shareholders to vote in favor of the Proposed Transaction. Defendants were obligated to carefully review the Registration Statement before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions. However, the Registration Statement misrepresents and/or omits material information that is necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Proposed Transaction, in violation of Sections 14(a) and 20(a) of the Exchange Act.

*Financial Forecasts*

25. The Registration Statement discloses tables for forecasts for both Maxim and Analog (the "Projections"). However, the Registration Statement fails to provide material information concerning these Projections, which were developed by the Company's management and relied upon by the Board in recommending that the shareholders vote in favor of the Proposed Transaction. These financial forecasts were also relied upon by the Company's financial advisor, J.P. Morgan, in rendering its fairness opinion.

26. With respect to the Maxim Projections, the Registration Statement fails to provide: (i) the value of certain line items used to calculate (a) EBITDA, (b) EBIAT, and (c) Unlevered Free Cash Flow, all of which are non-GAAP measures; (ii) a reconciliation to its most comparable GAAP measures, in direct violation of Regulation G and, consequently, Section 14(a); and (iii) stock-based compensation, which was utilized in the calculation of EBITDA and EBIAT.

27. With respect to the Analog Projections, the Registration Statement fails to provide: (i) the value of certain line items used to calculate (a) EBITDA, (b) EBIAT, and (c) Unlevered Free Cash Flow, all of which are non-GAAP measures; (ii) a reconciliation to its most comparable GAAP measures, in direct violation of Regulation G and, consequently, Section 14(a); and (iii) stock-based compensation, which was utilized in the calculation of EBITDA and EBIAT.

28. The SEC has indicated that if the most directly comparable GAAP measure is not

accessible on a forward-looking basis, the company must disclose that fact, provide any reconciling information that is available without unreasonable effort, identify any unavailable information and disclose the probable significance of that information. A company is permitted to provide the projected non-GAAP measure, omit the quantitative reconciliation and qualitatively explain the types of gains, losses, revenues or expenses that would need to be added to or subtracted from the non-GAAP measure to arrive at the most directly comparable GAAP measure, without attempting to quantify all those items.

29. When a company discloses non-GAAP financial measures in a registration statement that were relied on by a board of directors to recommend that shareholders exercise their corporate suffrage rights in a particular manner, the company must, pursuant to SEC regulatory mandates, also disclose all forecasts and information necessary to make the non-GAAP measures not misleading, and must provide a reconciliation (by schedule or other clearly understandable method) of the differences between the non-GAAP financial measure disclosed or released with the most comparable financial measure or measures calculated and presented in accordance with GAAP. 17 C.F.R. § 244.100.

30. Indeed, the SEC has increased its scrutiny of the use of non-GAAP financial measures in communications with shareholders. Former SEC Chairwoman Mary Jo White has stated that the frequent use by publicly traded companies of unique company-specific, non-GAAP financial measures (as Maxim included in the Registration Statement here), implicates the centerpiece of the SEC's disclosures regime:

> In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation. Jim Schnurr, our Chief Accountant, Mark Kronforst, our Chief Accountant in the Division of Corporation Finance and I, along with other members of the staff, have spoken out frequently about our concerns to raise the awareness of boards, management and investors. And last month, the staff issued guidance addressing a number of troublesome practices *which can make non-GAAP disclosures misleading*: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data. I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures. I also urge again, as I

did last December, that appropriate controls be considered and that audit committees carefully oversee their company's use of non-GAAP measures and disclosures.[1]

31. The SEC has repeatedly emphasized that disclosure of non-GAAP forecasts can be inherently misleading and has therefore heightened its scrutiny of the use of such forecasts.[2] Indeed, the SEC's Division of Corporation Finance released a new and updated Compliance and Disclosure Interpretation ("C&DI") on the use of non-GAAP financial measures to clarify the extremely narrow and limited circumstances, known as the business combination exemption, where Regulation G would not apply.[3]

32. More importantly, the C&DI clarifies when the business combination exemption does not apply:

> There is an exemption from Regulation G and Item 10(e) of Regulation S-K for non-GAAP financial measures disclosed in communications subject to Securities Act Rule 425 and Exchange Act Rules 14a-12 and 14d-2(b)(2); it is also intended to apply to communications subject to Exchange Act Rule 14d-9(a)(2). This exemption does not extend beyond such communications. Consequently, if the same non-GAAP financial measure that was included in a communication filed under one of those rules is also disclosed in a Securities Act registration statement, proxy statement, or tender offer statement, this exemption from Regulation G and Item 10(e) of Regulation S-K would not be available for that non-GAAP financial measure.

*Id.*

33. Thus, the C&DI makes clear that the so-called "business combination" exemption from the Regulation G non-GAAP to GAAP reconciliation requirement applies solely to the extent

---

[1] Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), https://www.sec.gov/news/speech/chair-white-icgn-speech.html (last visited Aug. 18, 2020) (emphasis added).

[2] *See, e.g.*, Nicolas Grabar and Sandra Flow, *Non-GAAP Financial Measures: The SEC's Evolving Views*, HARVARD LAW SCHOOL FORUM ON CORPORATE GOVERNANCE (June 24, 2016), https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measures-the-secs-evolving-views/ (last visited Aug. 18, 2020); Gretchen Morgenson, *Fantasy Math Is Helping Companies Spin Losses Into Profits*, N.Y. TIMES, Apr. 22, 2016, http://www.nytimes.com/2016/04/24/business/fantasy-math-is-helping-companies-spin-losses-into-profits.html?_r=0 (last visited Aug. 18, 2020).

[3] *Non-GAAP Financial Measures*, U.S. SECURITIES AND EXCHANGE COMMISSION (Apr. 4, 2018), https://www.sec.gov/divisions/corpfin/guidance/nongaapinterp.htm#101 (last visited Aug. 18, 2020). To be sure, there are other situations where Regulation G would not apply but are not applicable here.

that a third-party, such as a financial advisor, has utilized projected non-GAAP financial measures to render a report or opinion to the Board. To the extent the Board also examined and relied on internal financial forecasts to recommend a transaction, Regulation G applies.

34. Thus, to bring the Registration Statement into compliance with Regulation G as well as cure the materially misleading nature of the forecasts under SEC Rule 14a-9 as a result of the omitted information, Defendants must provide a reconciliation table of the non-GAAP measures to the most comparable GAAP measures.

35. With respect to J.P. Morgan's *Discounted Cash Flow Analysis* for Maxim, the Registration Statement fails to disclose: (i) all line items used to calculate unlevered free cash flows; (ii) the underlying inputs used to derive the discount rate of 8.25% to 10.25%; (iii) the terminal values for Analog; (iv) the basis for applying terminal value growth rate ranging from 2.5% to 3.5%; (v) the number of fully diluted outstanding shares of Maxim common stock; and (vi) the net cash balance of Maxim.

36. With respect to J.P. Morgan's *Transaction Multiples Analysis* for Maxim, the Registration Statement fails to disclose the basis for J.P. Morgan to select a FV/NTM EBITDA reference range of 17.0x to 26.5x.

37. With respect to J.P. Morgan's *Discounted Cash Flow Analysis* for Analog, the Registration Statement fails to disclose: (i) all line items used to calculate unlevered free cash flows; (ii) the underlying inputs used to derive the discount rate of 8.25% to 10.25%; (iii) the terminal values for Analog; (iv) the basis for applying terminal value growth rate ranging from 2.5% to 3.5%; (v) the number of fully diluted outstanding shares of Analog common stock; and (vi) the net cash balance of Analog.

38. The Registration Statement also fails to disclose whether the Company had entered into any confidentiality agreements that contained standstill and/or "don't-ask-don't-waive" provisions and if they are still in effect.

39. In sum, the Registration Statement independently violates both: (i) Regulation G, which requires a presentation and reconciliation of any non-GAAP financial measure to their most directly comparable GAAP equivalent; and (ii) Rule 14a-9, since the material omitted information

renders certain statements, discussed above, materially incomplete and misleading. As the Registration Statement independently contravenes the SEC rules and regulations, Defendants violated Section 14(a) and Section 20(a) of the Exchange Act by filing the Registration Statement to garner votes in support of the Proposed Transaction from Maxim shareholders.

40. Absent disclosure of the foregoing material information prior to the special shareholder meeting to vote on the Proposed Transaction, Plaintiff will not be able to make a fully informed decision regarding whether to vote in favor of the Proposed Transaction, and she is thus threatened with irreparable harm, warranting the injunctive relief sought herein.

### FIRST CAUSE OF ACTION
**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and 17 C.F.R. § 244.100 Promulgated Thereunder)**

41. Plaintiff repeats and re-alleges each allegation set forth above as if fully set forth herein.

42. Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy statement or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

43. As set forth above, the Registration Statement omits information required by SEC Regulation G, 17 C.F.R. § 244.100, which independently violates Section 14(a). SEC Regulation G, among other things, requires an issuer that chooses to disclose a non-GAAP measure to provide a presentation of the "most directly comparable" GAAP measure, and a reconciliation "by schedule or other clearly understandable method" of the non-GAAP measure to the "most directly comparable" GAAP measure. 17 C.F.R. § 244.100(a).

44. The failure to reconcile the numerous non-GAAP financial measures included in the Registration Statement violates Regulation G and constitutes a violation of Section 14(a).

**SECOND CAUSE OF ACTION**
**(Against All Defendants for Violations of Section 14(a) of the Exchange Act
and Rule 14a-9 Promulgated Thereunder)**

45. Plaintiff repeats and re-alleges each allegation set forth above as if fully set forth herein.

46. SEC Rule 14a-9 prohibits the solicitation of shareholder votes in registration statements that contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading…" 17 C.F.R. § 240.14a-9.

47. Regulation G similarly prohibits the solicitation of shareholder votes by "mak[ing] public a non-GAAP financial measure that, taken together with the information accompanying that measure . . . contains an untrue statement of a material fact or omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure . . . not misleading." 17 C.F.R. § 244.100(b).

48. Defendants have issued the Registration Statement with the intention of soliciting shareholder support for the Proposed Transaction. Each of the Defendants reviewed and authorized the dissemination of the Registration Statement, which fails to provide critical information regarding, amongst other things, the financial forecasts for the Company.

49. In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Registration Statement, but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

50. The Individual Defendants knew or were negligent in not knowing that the Registration Statement is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon the omitted

information identified above in connection with their decision to approve and recommend the Proposed Transaction.

51. The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Registration Statement, rendering the sections of the Registration Statement identified above to be materially incomplete and misleading.

52. The Individual Defendants were, at the very least, negligent in preparing and reviewing the Registration Statement. The preparation of a registration statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. The Individual Defendants were negligent in choosing to omit material information from the Registration Statement or failing to notice the material omissions in the Registration Statement upon reviewing it, which they were required to do carefully as the Company's directors. Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial forecasts.

53. Maxim is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Registration Statement.

54. The misrepresentations and omissions in the Registration Statement are material to Plaintiff, who will be deprived of her right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.

55. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

**THIRD CAUSE OF ACTION**
**(Against the Individual Defendants for**
**Violations of Section 20(a) of the Exchange Act)**

56. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

57. The Individual Defendants acted as controlling persons of Maxim within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of Maxim, and participation in and/or awareness of the Company's operations and/or

intimate knowledge of the incomplete and misleading statements contained in the Registration Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

58. Each of the Individual Defendants was provided with or had unlimited access to copies of the Registration Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

59. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The Registration Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were thus directly involved in preparing the Registration Statement.

60. In addition, as the Registration Statement sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Registration Statement purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

61. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

62. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

63. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's

equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## RELIEF REQUESTED

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Preliminarily and permanently enjoining Defendants and their counsel, agents, employees and all persons acting under, in concert with, or for them, from proceeding with, consummating, or closing the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Registration Statement;

B.     In the event that the proposed transaction is consummated, rescinding it and setting it aside, or awarding rescissory damages;

C.     Awarding compensatory damages against Defendants, individually and severally, in an amount to be determined at trial, together with pre-judgment and post-judgment interest at the maximum rate allowable by law, arising from the Proposed Transaction;

D.     Awarding Plaintiff the costs and disbursements of this action and reasonable allowances for fees and expenses of Plaintiff's counsel and experts; and

E.     Granting Plaintiff such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.

DATED: August 18, 2020

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

By:   */s/ Rachele R. Byrd*
RACHELE R. BYRD
MARISA C. LIVESAY
BRITTANY N. DEJONG
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
byrd@whafh.com
livesay@whafh.com
dejong@whafh.com

|     |                                                                 |
| --- | --------------------------------------------------------------- |
| 1   |                                                                 |
| 2   | **Of Counsel**:                                                 |
| 3   | **WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**                   |
| 4   | GLORIA KUI MELWANI                                              |
| 5   | 270 Madison Avenue                                              |
|     | New York, NY 10016                                              |
| 6   | Telephone: (212) 545-4600                                       |
|     | Facsimile: (212) 686-0114                                       |
| 7   | *Counsel for Plaintiff*                                         |

808331

COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a)
AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934